In re **BRIDGESTONE/FIRESTONE, INC. TIRES PRODUCTS LIABILITY LITIGATION.**

No. IP 00–9373–C–B/S.
MDL No. 1373.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 31, 2001.

---

Don Barrett, Barrett Law Office Pa, Lexington, MS, Victor Manuel Diaz Jr, Podhurst Orseck Josefsberg & Eaton, Miami, FL, Mike Eidson, Colson Hicks Eidson, Coral Gables, FL, Irwin B Levin, Cohen & Malad, William E Winingham, Wilson Kehoe & Winingham, Indianapolis, IN, for plaintiffs.

John H Beisner, O'Melveny & Myers LLP, Washington, DC, Daniel P Byron, McHale Cook & Welch Pc, Indianapolis, IN, Mark Herrmann, Jones Day Reavis & Pogue Thomas S Kilbane, Squire Sanders & Dempsey LLP, Cleveland, OH, Mark Merkle, Krieg Devault Alexander & Capehart, Randall Riggs, Locke Reynolds LLP, Colin P Smith, Holland & Knight LLP, Chicago, IL, Thomas G Stayton, Baker & Daniels, Indianapolis, IN, for defendants.

### ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND RULING ON RELATED MATTERS

BARKER, District Judge.

### INTRODUCTION

The Judicial Panel on Multidistrict Litigation ("MDL") transferred this action to this court, pursuant to 28 U.S.C. § 1407, on October 26, 2000. On January 2, 2001, Plaintiffs in a number of transferred cases filed their Master Complaint in this district against Ford Motor Company ("Ford"), Bridgestone/Firestone, Inc. ("Firestone"), and Bridgestone Corporation ("Bridgestone"). One month later, Plaintiffs filed a Motion for Class Certification. For the reasons ex-

plained below, on November 28, 2001, we *GRANTED* in part and *DENIED* in part the Motion for Class Certification. Defendants filed Motions to Reconsider the November 28, 2001 Order. We now set forth fully our reasons for the class certification order, and in doing so, hereby *DENY* Defendants' Motions to Reconsider that ruling.[1] Also as explained below, Ford's Motion for Reconsideration of the Court's "Order Granting in Part and Denying in Part the Motion to Dismiss the Master Complaint" ("July 27, 2001 Order") is *DENIED*. For similar reasons, Firestone's Motion for 28 U.S.C. § 1292 Certification of the July 27, 2001 Order is *DENIED*. This entry also explains our decision to *GRANT* Plaintiffs' Motion for Reconsideration of Ruling on the Scope of the TCPA [2]/MCPA [3] in July 27 Order Granting in Part and Denying in Part the Motion to Dismiss the Master Complaint. Further, it is ordered that Plaintiffs submit for approval by January 16, 2002, the proposed notice to class members and tender therewith their proposed method and schedule for disseminating said notice.

### PRELIMINARY MATTERS

#### A. Choice of Law Determination in the July 27, 2001 Order

■ In connection with the July 27, 2001 Order on Defendants' Motion to Dismiss, *In re Bridgestone/Firestone, Inc. Tires Products Liability Litig.*, 155 F.Supp.2d 1069 (S.D.Ind.2001), the Court determined that, under Indiana choice of law rules, Michigan law applies to the Class Plaintiffs' claims against Ford and Tennessee law applies to the Class Plaintiffs' claims against Firestone. Ford has asked us to reconsider that ruling or, in the alternative, to certify the choice of

1. The classes are defined as set forth in the November 28, 2001 Order Certifying Classes.

2. Tennessee Consumer Protection Act. Tenn. Code Ann. § 47–18–102 *et seq.*

3. Michigan Consumer Protection Act. Mich. Comp. Laws § 445.901 *et seq.*

4. Firestone gives no more than lip service to the notion that the Court would have dismissed additional claims of some of the named Plaintiffs had it applied the law of each Plaintiff's home state, rather than Tennessee law, to those claims, failing even to attempt to analyze how and to what extent that would be so. *See* Firestone's Memo-

law question to the Indiana Supreme Court. Firestone has filed a motion requesting that we certify the ruling for an interlocutory appeal to the Seventh Circuit pursuant to 28 U.S.C. § 1292(b).

Firestone's Motion for 28 U.S.C. § 1292 Certification is easily resolved. It is clear that Firestone seeks review of the choice of law determination, not because of its impact on the Court's substantive rulings that certain claims alleged in the Master Complaint should not be dismissed,[4] but instead because of its impact on the propriety of class certification. The choice of law determination set forth in the July 27, 2001 Order is, in fact, an important element of the class certification analysis and is hereby incorporated by reference into our ruling on class certification. Accordingly, should the Seventh Circuit be inclined to review the choice of law determination, it will have the opportunity to do so as part of an appeal of the class certification ruling, which Defendants may seek pursuant to Federal Rule of Civil Procedure 23(f). Therefore, we deny Firestone's request for certification of the July 27, 2001 Order for interlocutory appeal.

■ Ford's Motion for Reconsideration of the Court's July 27, 2001 Order also is quickly addressed, inasmuch as it does little more than rehash arguments we considered and addressed the first time around. A motion to reconsider under Rule 59 "is not a vehicle for rearguing previously rejected motions," *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir.2000), *cert. denied*, 531 U.S. 1152, 121 S.Ct. 1097, 148 L.Ed.2d 970 (2001), and Ford's motion essentially does just that.[5] The only new argument made in

randum of Support of Motion for 28 U.S.C. § 1292 Certification at 3.

5. In their challenge to the Court's choice of law determination in the July 27, 2001 Order, Defendants focus primarily on choice of law for purposes of the Class Plaintiffs' contract-based claims (warranty and unjust enrichment), which holdings the Court incorporates in this entry. Defendants, however, also have challenged the Court's choice of law ruling with respect to the Class Plaintiffs' tort claims, acknowledging that those claims (based on consumer protection statutes) were the subject of a motion to reconsider filed by Plaintiffs and, thus, remain at issue in

Ford's motion to reconsider is its complaint that the Court's ruling "effectively declares erroneous all parallel rulings by Indiana's appellate courts." *See* Ford's Motion to Reconsider at 6–8. However, as Ford acknowledges, not one of the "parallel rulings" (in Indiana breach of warranty cases) it cites for the proposition that choice of law for contract-based claims is dictated by the place of purchase of an allegedly defective product contains any explicit choice of law analysis. Rather, Ford attempts to fashion binding precedent out of the fact that in the cases it cites "Indiana courts and the parties *instinctively* applied the law of the place where the product was purchased and used." *Id.* at 8. We do not infer as much from the courts' silence in these cases. That these courts did not make a choice of law analysis is not surprising, in light of the fact that "[i]t is well established in Indiana that if the law of another state is not pleaded or no steps are taken to require the court to take judicial notice of that law ... the court will presume the law in that jurisdiction is substantially the same as the law in Indiana." *Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.*, 492 N.E.2d 686, 691 (Ind.1986). Therefore, the courts of Indiana typically will apply Indiana law unless the parties raise a conflict of laws issue. And, given the general uniformity of warranty law, it is also not surprising that the parties rarely have any reason to urge the application of another state's laws.

Indeed, the weakness of Ford's contention that choice of law should be made with reference to the place where the product was "purchased and used" is apparent, because a product is not necessarily purchased and used in the same state. Ford concedes in a footnote that Defendants argued in the con-

text of their motion to dismiss that the law of the state of each Plaintiff's residence should apply, but it now appears to argue that the law of the state in which each Plaintiff purchased the Tires [6] or Explorers should apply, explaining that "[s]ince consumers normally buy tires and vehicles at or near their place of residence, defendants intended the term 'residence' to be shorthand for an amalgam of these factors—the place of contracting to buy the tires and/or vehicle, the place of contract negotiations, the site of performance, and the location of the contract's subject matter." Ford's Motion to Reconsider at 10 n. 11. Obviously, it would not be unusual for consumers who, for example, live in communities bordering two or more states regularly to purchase products outside their state of residence. Ford does not explain why the states of purchase, rather than the states of Plaintiffs' residence, should apply. And what about the state in which the vehicle (and the Tires on it) was primarily used, which could be a different state altogether (or, perhaps for some Plaintiffs, numerous states)?

Ford also did not explain in its briefing on the motion to dismiss, and does not explain now, why it believes that the state in which each Plaintiff purchased his or her Explorer is more intimately connected to the facts relevant to this case than Michigan, the state in which countless relevant acts by Ford employees were undertaken over a period of many years. The closest Defendants come to such an explanation is their argument that Plaintiffs, as consumers, would not have expected Tennessee or Michigan law to apply to their claims, and indeed that such a thought would likely have "shocked" them. Supp. Memo in Opp. at 16. Fortunately even

this case. Because the Court is granting Plaintiffs' motion to reconsider portions of its July 27, 2001 Order relating to claims under the Michigan and Tennessee consumer protection acts, we address briefly here Defendants' arguments that the choice of law determination for tort claims was incorrect. As with their contract choice of law arguments, Defendants have done nothing more than re-hash (though perhaps more vehemently) the arguments they have already advanced. Moreover, Defendants' motions do not even acknowledge, let alone distinguish, the Indiana decisions upon which this Court relied in making its ruling, nor do they address the

important distinction we drew in the July 27, 2001 Order between choice of law in this "no injury"/"no manifestation of defect" case and cases involving personal injury to the plaintiff. *See Bridgestone/Firestone*, 155 F.Supp.2d at 1081 n. 9. In any event, we have examined this issue at length in connection with the July 27, 2001 Order and reaffirm the conclusions reached there.

6. The term "Tires," as used in this entry, means those tires set forth in the Class definition contained in the Court's November 28, 2001 Order.

for the Defendants, courts generally do not decide legal issues based upon the emotional reactions of lay persons. The Supreme Court in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 822, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), does instruct that the expectation of the parties is an important consideration in determining whether the application of a particular state's law is so "arbitrary and unfair" that it exceeds constitutional limits. However, not surprisingly, Defendants cite no case in which the application of the law of the defendant's home state, where significant conduct relevant to the plaintiff's claim took place, was found to be unconstitutional.[7]

The remainder of Ford's arguments are addressed in the July 27, 2001 Order, *Bridgestone/Firestone,* 155 F.Supp.2d at 1078–85, and we decline Ford's request to reexamine those arguments now. We further deny Ford's request that we certify the choice of law question to the Indiana Supreme Court.

## B. Choice of Law as Affected by the Evidentiary Submissions Made in the Class Certification Context

 When we made our choice of law determination in the context of our July 27, 2001 Order, we took as true all of the Plaintiffs' allegations, including their factual allegations relevant to the choice of law determination. Consistent with the holding in *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 348, 151 L.Ed.2d 263, we invited the parties to present any facts relevant to the choice of law analysis in the context of the class certification briefing and argument because, as *Szabo* makes clear, a trial court is required to resolve relevant factual dis-

putes in ruling on a motion for class certification.[8] In response to the Court's invitation, Firestone submitted evidence as part of its opposition to the Plaintiffs' Motion for Class Certification which it contends contradicts the factual allegations made by the Plaintiffs regarding the choice of law issue.[9] Specifically, Firestone has submitted evidence that demonstrates the following:

1. Firestone's engineers perform their tire design work in Akron, Ohio, not Tennessee. Supp. Memo. at 12 (citing Wyant Dep. at 283; Lampe Dep. at 610);

2. Firestone's national advertising (which presumably is approved in Tennessee, although Firestone does not say) is limited; the majority of advertising is conducted "by Firestone's regional offices, local affiliated Firestone stores, and independent, unaffiliated tire dealerships and mass merchandisers" in states other than Tennessee. *Id.* at 13.

3. Warranty adjustment data was collected "in the field" by Firestone's regional offices around the nation. *Id.* at 13–14 (citing Ball Dep. at 86; Laubie Dep. at 66). Notably, however, Firestone fails to cite to Mr. Ball's testimony that this warranty adjustment data was sent to, and analyzed by, Firestone in Tennessee. Ball Dep. at 87. Firestone does not explain why the places adjustment data was collected, rather than the centralized place it was analyzed, is a significant factor.[10]

Firestone's evidence does demonstrate that not all of Firestone's conduct relevant to

---

7. The application of Kansas law was found unconstitutional in *Shutts* as to many of the plaintiffs in a nationwide class action suit because those plaintiffs' claims had absolutely no connection to Kansas whatsoever—neither the plaintiff nor the defendant resided in Kansas, and no conduct relevant to the dispute took place in Kansas.

8. *See* Order Setting Hearing dated September 7, 2001; Transcript of November 16, 2001 Hearing on Plaintiffs' Motion for Class Certification ("Transcript") at 8.

9. Other than a passing reference by Ford to the fact that not all of its activities related to adver-

tising took place in Michigan, Ford did not submit any evidence, either with its written submissions or at the class certification hearing, to suggest that its actions relevant to the Plaintiffs' claims took place somewhere other than Michigan.

10. Firestone also points to the fact that the Tires were manufactured at various Firestone plants outside of Tennessee; however, because Plaintiffs do not assert that the Tires have a manufacturing defect, the place of manufacture is irrelevant to the choice of law analysis.

Plaintiffs' claims took place in Tennessee, and indeed that certain significant aspects of its conduct—the actual design of the Tires by Firestone's engineers—took place outside of Tennessee.[11] Even so, Firestone has not demonstrated that the preponderance of its relevant conduct took place somewhere other than Tennessee.

■ In making choice of law decisions in contract cases, Indiana courts " 'will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.' " *Hubbard Mfg. Co., Inc. v. Greeson*, 515 N.E.2d 1071, 1073 (Ind.1987) (quoting *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417, 423 (1945)). This rule was first articulated by the Indiana Supreme Court in *Hughes*, in which the Court found persuasive the reasoning of the authors of a commonly-used casebook of the time, Harper and Taintor, *Cases on Conflict of Laws*, (1937):

> Many courts purport to find the most significant contact point, with respect to contractual transactions, at the place intended by both parties. It seems, rather, that these courts examine all the circumstances which could be supposed to have influenced the actions of the parties, and find the most intimate contact at that place which might be characterized as the center of gravity of the circumstances.
>
> There is evident benefit in taking this accumulation of contact points as paramount, since then many difficult questions with respect to the identification of the place of contracting or the place of performance will be avoided; and, furthermore, this result harmonizes with a sense of appropriateness: that is to say, *it is appropriate that a transaction be governed by the law of the state with which it is most closely in contact, not because of the quasi-localization of a legal concept-place of contracting, place of performance, intention of the parties—but because of the closeness of factual contacts between that state and the significant acts of the parties.*

*Hughes*, 63 N.E.2d at 423 (emphasis added). In other words, the Indiana Supreme Court rejected a mechanical "place of breach" rule in favor of a more flexible rule that looks to the law of the state in which the "significant acts of the parties" took place. *See Greeson*, 515 N.E.2d at 1073 (so characterizing the *Hughes* holding). Subsequent Indiana cases have considered the following factors, set forth in the Restatement (Second) of Conflict of Laws, as among those relevant to this analysis: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, residence, nationality, place of incorporation and place of business of the parties. *See, e.g., Travelers Indemnity Co. v. Summit Corp. of America*, 715 N.E.2d 926, 931 (Ind.Ct.App. 1999); *Eby v. York–Division, Borg–Warner*, 455 N.E.2d 623, 626 (Ind.Ct.App.1983) (both citing *Restatement (Second) of Conflict of Laws* § 188 (1971)).

■ Both Defendants cite the Restatement factors and insist that the law of the state in which each Plaintiff purchased Defendants' product(s) must apply to that Plaintiff's claims. However, Defendants' analysis is flawed in several respects. First, Defendants argue that the relevant contract is the purchase of the Explorer or Tires, and therefore the place of performance was the place of the purchase. As to the breach of warranty claims, this is simply incorrect. The relevant contract is the warranty, and because Plaintiffs presumably could have sought performance under the warranty in any state upon discovering a defect, the place of performance was unknown at the time of the purchase. The place of performance is "assigned little weight when, as here, at the time of contracting the place of performance is either uncertain or unknown." *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind.Ct.App.1999) (citing *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind.Ct.App.1997) and *Restatement (Second) of Conflict of Laws*

---

11. We note that Firestone does not argue that the law of Ohio, where the design of the Tires took place, should apply to the Plaintiffs' claims against it.

§ 188 cmt. e (1971)). The Defendants also argue that the place of negotiation is relevant, which ignores the practical reality that the warranties at issue were not negotiated at all, but rather either were standard written warranties, the terms of which were determined entirely by the Defendants, or were, in the case of the·implied warranty of merchantability, simply implied by law. Therefore, the place of negotiation is not a relevant factor in this case. We also accord little weight to the location of the contract's subject matter in this case, in that both the Explorer and the Tires are, by their very nature, designed to be mobile. Further, "standing alone, the place of contracting is a relatively insignificant contact." *Travelers Indem. Co.,* 715 N.E.2d at 932 (quoting *Restatement (Second) of Conflicts of Laws* § 188 cmt. e (1971)).

The remaining two *Restatement* factors are the plaintiff's domicile and the defendant's domicile. Substantial (although, as Firestone has demonstrated, not all) conduct relevant to Plaintiffs' claims took place at each Defendant's principal place of business, while Defendants have pointed to no corresponding substantial relevant conduct that took place in Plaintiffs' home states. Accordingly, having considered all the evidence presented by the parties, we reaffirm our prior determination that Michigan and Tennessee are the states with the most intimate contacts with the facts relevant to Plaintiffs' claims, and therefore, under Indiana choice of law rules, the law of Michigan must be applied to the claims against Ford and the law of Tennessee must be applied to the claims against Firestone.

## C. Ford's Motion to Reconsider Rejection of Its "No Injury" Argument

In its motion to reconsider the July 27, 2001 Order, Ford takes issue with the Court's determination that, unlike their tort claims, Plaintiffs' breach of warranty and unjust enrichment claims were not subject to dismissal based upon the fact that Plaintiffs suffered no manifest injury as a result of the defects they allege. Our July 27, 2001 Order fully addresses Ford's arguments on this issue, and we deny Ford's request to reexamine those arguments. We also decline Ford's invitation to certify the question to the Michigan Supreme Court.

## D. Plaintiffs' Motion to Reconsider Availability of Nationwide Class Actions Under the TCPA and MCPA

██ In the July 27, 2001 Order, the Court dismissed Plaintiffs' Tenth Claim for Relief to the extent Plaintiffs asserted such claims against Firestone and Ford "for all others similarly situated." [12] We held that "Plaintiffs cannot maintain a class action under either the TCPA or MCPA" because (1) "[b]y its terms, the TCPA does not provide for class actions," and (2) class actions may be brought under the MCPA only on behalf of "Michigan residents and injurees." *Bridgestone/Firestone,* 155 F.Supp.2d at 1105. Plaintiffs ask us to reconsider this ruling on the grounds that the TCPA actually does permit class actions and that Federal Rule of Civil Procedure 23 trumps any state law purporting to limit class actions in federal court based on state law. Plaintiffs' Motion to Reconsider at 3.

██ This situation presents a classic case for reconsideration. Reconsideration is appropriate where the court "has made a decision outside the adversarial issues presented to the Court by the parties." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990). Due to the parties' opposing positions on choice of law, Defendants did not raise the issue of unavailability of classwide relief under the TCPA or the MCPA until their reply brief. Hence, Plaintiffs did not squarely address this issue in their argument in opposition to the motion to dismiss. Absent adversarial briefing on this problem, certain key cases were not called to our attention. We examine our prior ruling in light of these cases.

---

**12.** In our earlier ruling, we allowed that Plaintiffs may be able to maintain their consumer protection act claims on an individual basis, after alleging reliance, but not as a class action. The aspect of our ruling related to reliance is addressed in the section of this entry concerning predominance.

In *Bridgestone/Firestone*, 155 F.Supp.2d at 1105, we addressed the meaning of the terms of the TCPA. Specifically, the statute permits "[a]ny person who suffers an ascertainable loss of money or property ... as a result of the use or employment ... of an unfair or deceptive act or practice ... [to] bring an action *individually* to recover actual damages." Tenn.Code Ann. § 47–18–109(a)(1) (emphasis added). Based on this language, we accepted Defendant Firestone's argument that class actions are not permitted under the TCPA. *Bridgestone/Firestone*, 155 F.Supp.2d at 1105. However, in requesting reconsideration, Plaintiffs make two points. First, Tennessee state courts have certified classes in cases involving claims under the TCPA. *See Carter v. First Tennessee Bank*, No. 3894 (Fayette Cty. Cir. Ct., Jan. 8, 2001) (certifying a class for TCPA and other claims); *Robinson v. EMI Music Dist.*, 1996 WL 495551 (Tenn.Cir.Ct.1996) (same); *Crump v. WorldCom, Inc.*, 128 F.Supp.2d 549, 552 (W.D.Tenn.2001) (remanding case involving TCPA claims to state court, where class previously had been conditionally certified). Defendant Firestone correctly notes that none of these cases has specifically addressed the issue raised by the language of the TCPA authorizing individual actions. Opp. at 10. However, we find that the courts in *Carter*, *Robinson*, and *Crump* have at least implicitly, and necessarily, interpreted the TCPA not to preclude class actions. This point brings us to the second matter raised in Plaintiffs' briefs: in general, we must defer to a state court's interpretation of the state's statute. *Williams v. Duckworth*, 738 F.2d 828, 833 (7th Cir.1984). We acknowledge the possibility that Tennessee lower courts might have misinterpreted the state statute,[13] but we are unwilling to contradict their decisions regarding the TCPA, now that we know of these cases, in favor of our prior finding. *See U.S. ex rel. Burnett v. Illinois*, 619 F.2d 668, 671 (7th Cir.1980) ("Errors in the interpretation of state authority are for the state supreme court to correct."). Hence, we find that based on interpretations by Tennessee courts, nothing in the TCPA prohibits this court from certifying a class of consumer protection claimants.

We turn next to address Plaintiffs' arguments concerning our prior decision that the MCPA prohibits nationwide class actions. The MCPA states that "[a] person who suffers a loss as a result of a violation of this act may bring a class action *on behalf of persons residing or injured in this state* for the actual damages caused by [the acts prohibited]." Mich. Comp. Laws § 445.911(3) (emphasis added). In our earlier ruling, we noted that none of the named Plaintiffs are from Michigan and that Plaintiffs did not argue that all members of the proposed classes were either injured in Michigan or residents of Michigan. On this basis, in light of the statutory language, we concluded that Plaintiffs could not maintain a nationwide class. Defendant Ford urges the Court to adhere to its earlier ruling. Plaintiffs, in their motion to reconsider, argue that *Erie* principles require the application of Federal Rule of Civil Procedure 23 in federal court, rather than the use of any state law attempting to limit state-law based class actions. Plaintiffs' Motion to Reconsider at 3 (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). We consider Plaintiffs' motion to be well taken.

The shorthand of *Erie* is that federal courts sitting in diversity cases "apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). The difficulty in using the *Erie* formula is in determining whether a disputed rule is "substantive" or "procedural." Because the federal law at issue here is a Federal Rule of Civil Procedure, our task in applying *Erie* principles to the case before us is slightly different. In *Hanna*, the Supreme Court directed:

> When a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the relatively un-

---

13. We note, in defense of the Tennessee courts' decisions to certify classes, that the term "individual" in statutory language often is not interpreted to exclude the possibility of class certification. *See Califano v. Yamasaki*, 442 U.S. 682,

700, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979) ("Indeed, a wide variety of federal jurisdictional provisions speak in terms of individual plaintiffs, but class relief has never been thought to be unavailable to them.").

guided Erie Choice: the court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions.

380 U.S. at 471, 85 S.Ct. 1136. Therefore, first we must determine whether the scope of Rule 23 is sufficiently broad to control the issue before us. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980); *Burlington Northern Railroad Co. v. Woods*, 480 U.S. 1, 4–5, 107 S.Ct. 967, 94 L.Ed.2d 1 (1987). If so, and if the Federal Rule is consistent with the Rules Enabling Act and the Constitution, then we must apply Rule 23. *Hanna*, 380 U.S. at 471, 85 S.Ct. 1136.

We find that Rule 23 does cover the situation before us. As we noted in our earlier ruling, Plaintiffs may be able to maintain individual consumer protection claims against Ford under the MCPA, regardless of their states of residence or injury. *In re Bridgestone/Firestone*, 155 F.Supp.2d at 1106 (citing *Nesbitt v. American Community Mutual Ins. Co.*, 236 Mich.App. 215, 600 N.W.2d 427, 433 (1999) (permitting non-resident plaintiff to sue his deceased wife's Michigan health insurer under MCPA)). Hence, Plaintiffs have the substantive right to sue Ford for its alleged violations of the consumer protection act. The question before us now is *how* these Plaintiffs can proceed in pursuing relief. Federal Rule 23 covers this issue. It sets forth numerous standards for determining whether a class action is maintainable. If Plaintiffs satisfy these standards, a question examined elsewhere in this opinion, then they can pursue relief as a group. If not, then each claimant is left with the procedural remedy of suing on an individual basis.

Defendant Ford argues that the MCPA's restrictions on who may sue under the Act's class litigation provisions are substantive and that, therefore, Federal Rule 23, a procedural apparatus, does not control the issue before the court. Opp. to Reconsideration at 4. Ford's argument is based on the refinement of *Hanna* contained in *Burlington Northern* and *Walker*. In *Burlington Northern*, the Supreme Court required that the Federal Rule in question be " 'sufficiently broad' to cause a 'direct collision' with the state law or, implicitly, to 'control the issue' before the court, thereby leaving no room for operation of that law." 480 U.S. at 4–5, 107 S.Ct. 967 (quoting *Walker*, 446 U.S. at 749–50, 100 S.Ct. 1978). Ford is wrong on two grounds, however, to conclude on the basis of *Burlington Northern* and *Walker*, that "nothing in [Rule 23] sets up a 'direct collision' with the MCPA's substantive provisions limiting a person's right to bring consumer act claims to a narrow class of individuals." Opp. to Reconsideration at 4.

First, we do not find that the MCPA's limit of consumer actions to persons residing or injured in Michigan is substantive. The right to sue for damages caused by representing that a good is new when it is not, by representing that a good has sponsorship that it does not have, or by failing to reveal a material fact about a good is the substantive right granted by the MCPA. *See* Mich. Comp. Laws § 445.903(c)-(d), (s). Whether that substantive right can be vindicated through a class action or whether it must be pursued individually is a procedural question.[14] In *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 345–46 (7th Cir.1997), the Seventh Circuit ruled that the 30–day notice required before commencing a class action under a provision of the Wisconsin consumer protection act must give way to Rule 23, which does not contain a notice provision. The court in *Mace* ruled that the statutory designation of class action status to persons providing 30-days' notice to the defendant did not grant or deny a substantive right, but rather set forth a requirement as to how that substantive right was to be effectuated. *Id.* at 346. Likewise, here, the statutory designation of class action status to persons injured or residing in Michigan does not grant or deny a

---

14. Apparently, Tennessee courts view this issue similarly. For instance, in *Carter*, the court seems to have accepted the proposition that the named plaintiffs had a cause of action under the TCPA. The court then looked only to Tennessee Rule of Civil Procedure 23 to determine if the procedural requirements of class certification had been met.

substantive right, but explains how the substantive right to sue for consumer protection violations is to be exercised. Ford argues that whether one can sue on a representative basis (rather than whether one can sue at all) is a substantive right. *See* Opp. to Reconsideration at 3 n. 2. Ford's citation to *Mace* on this point is unavailing for the reasons just explained. Ford also cites *Kreindler v. Marx*, 85 F.R.D. 612, 616 (N.D.Ill.1979), in support of the proposition that whether class action status is available is a substantive right. *Kreindler* cannot do the labor Ford asks of it. In *Kreindler*, the district court ruled that plaintiff's status and standing as a shareholder to bring a derivative suit was a matter of state substantive law, not a question of Federal Rule 23.1. *Id.* However, status as a shareholder is the essence of what it means to bring a suit on behalf of the corporation to enforce the corporation's rights. For instance, a person who is not a shareholder does not suffer the type of injury a derivative suit addresses. In contrast, when a consumer does suffer the injury a consumer protection statute addresses, Rule 23 establishes the mechanism through which this consumer can bring an action in conjunction with other consumers who allegedly suffered injury as a result of the same conduct.

Second, contrary to Ford's argument, there is a direct collision between Rule 23 and § 445.911 of the MCPA. Although the court in *United States v. Dentsply Int'l, Inc.*, 2001 WL 624807, at \*16 (D.Del. March 30, 2001), reached the conclusion advanced by Ford, reasoning that "Rule 23 ... governs the manner of determining whether class certification is appropriate in federal courts; § 901(b) [a New York law barring class actions to recover a penalty] establishes a bar to certain claims being considered for class action treatment on a threshold level," we do not find this reasoning persuasive. Rule 23 does indeed set up the criteria for determining whether to certify a class. It instructs courts to look at numerosity, commonality of issues, and adequacy of representation, among other factors. Fed.R.Civ.P. 23.

However, the MCPA, insofar as it attempts to limit class actions to those residing or injured in Michigan, does not "bar" certain claims from being considered for class action status. Instead, it adds another criterion—injury or residence in Michigan—not contemplated by Rule 23's requirements of numerosity or commonality of issues. *See Califano*, 442 U.S. at 702, 99 S.Ct. 2545 ("Nothing in Rule 23, however, limits the geographical scope of a class action that is brought in conformity with that Rule."). In fact, this criterion conflicts with Rule 23, and in such situations, the federal rule controls. *See Hanna*, 380 U.S. at 465, 85 S.Ct. 1136; *Burlington Northern*, 480 U.S. at 7, 107 S.Ct. 967 (rendering ineffective state rule severely limiting discretion provided for by Federal Rules).[15]

For all of these reasons, the Court, having again considered its July 27, 2001 Order, now determines that nationwide class actions can be maintained to assert claims under the MCPA and TCPA.

## CLASS CERTIFICATION IS APPROPRIATE

On February 2, 2001, Plaintiffs filed a Motion for Class Certification, and the parties briefed the issue. On July 27, 2001, the Court ruled on Defendants' Motion to Dismiss. *Bridgestone/Firestone, Inc.*, 155 F.Supp.2d 1069. Because this ruling eliminated certain causes of action, we invited the parties to engage in supplemental briefing, which they have now completed. On November 16, 2001, a hearing on class certification was conducted at which the parties presented arguments and evidence in support of their respective positions. In our ruling dated November 28, 2001, we granted class certification in part and denied in part Plaintiffs' motion. The order now being issued reaffirms that ruling and explains the basis for our conclusion to certify an Explorer Class and Sub Class and a Tire Class. We also set forth our reasons for denying Plaintiffs' motion to certify a class of persons alleging property damage.

---

**15.** Defendant also argues that applying Rule 23 in this situation would transgress the Rules Enabling Act by creating a substantive right denied by Michigan law. Opp. to Reconsideration at 7.

For the reasons explained above, Rule 23 does not create a substantive right; it merely provides a means of effectuating the right granted by the MCPA.

## A. Standard for Class Certification

A class is appropriate for certification only if it meets the four prerequisites to a class action set out in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed.R.Civ.P. 23(a). Once this hurdle is cleared, the court also must ensure that the proposed class satisfies one of the three standards established by Rule 23(b). Here, Plaintiffs argue that the class can be certified under Rule 23(b)(3) or as a hybrid "23(b)(2)/(b)(3)" class action. Supplemental Memo. in Support at 1. Rule 23(b)(3) examines whether common questions of law or fact predominate over questions affecting individual members of the class and whether a class action is a superior method for resolving the controversy. Rule 23(b)(2) authorizes class certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

As mentioned earlier, *Szabo,* 249 F.3d at 675–76, controls the degree to which we examine the evidence submitted on the issue of class certification. In *Szabo,* the Seventh Circuit chastised the district court for accepting the allegations of the complaint as true when deciding whether to certify a class. 249 F.3d at 675 ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). Instead, the Court of Appeals directed that a district court must "make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. We understand our responsibility to be to receive evidence and resolve disputes pertaining to class certification even when that means "mak[ing] a preliminary inquiry into the merits." *Id.* With *Szabo* in mind, we begin by examining the four criteria identified in Rule 23(a).

## B. Requirements of Rule 23(a)[16]

### (1) Numerosity

A proposed class must be so large that joinder of all parties would be impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiffs claim that the proposed Tire Class and Explorer Class each consists of more than one million persons throughout the United States. Memo. in Support at 10. Defendants do not contest numerosity, and no evidence has been presented calling into question Plaintiffs' estimate of class size. Hence, the Court finds that the numerosity requirement for class certification has been met.

### (2) Commonality

To maintain a class action, there must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). The commonality requirement is ordinarily satisfied when there is "a common nucleus of operative facts." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). Not all questions of law or fact need to be identical as long as there are common questions at the heart of the case. *Hubler Chevrolet, Inc. v. General Motors Corp.,* 193 F.R.D. 574, 577 (S.D.Ind. 2000) (citations omitted). Plaintiffs maintain that Defendants' conduct in designing, warranting, advertising, and selling unreasonably dangerous products to customers, while engaging in a common plan to conceal these dangers, constitutes a common question of law or fact. A focus on the defendants' conduct often satisfies the commonality requirement. *Cf. Service Spring, Inc. v. Cambria Spring Co.,* 1984 WL 2925, at *2 (N.D.Ill. Jan.6, 1984) (defendants' alleged conspiracy and concealment of conspiracy satisfied commonality requirement in antitrust case). Furthermore, Defendants contest this issue only tangentially in their argument against predominance. Opp. at 11. For these reasons, we conclude that Plaintiffs satisfy the commonality requirement of Rule 23(a)(2).

---

**16.** The briefing of the parties reveals that there are no real disputes among them as to Plaintiffs' ability to make these showings. Lacking a formal stipulation among them, however, and to the extent there are differing views, we address each requirement here and in the context of our Rule 23(b) ruling.

### (3) Typicality

Rule 23(a) further requires that "the claims ... of the representative parties are typical of the claims ... of. the class." Fed. R.Civ.P. 23(a)(3). This requirement is satisfied where the named plaintiffs' claims "arise[ ] from the same ... practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (citation omitted). Here also, Defendants challenge typicality primarily as part of their attack on predominance. Named Plaintiffs for the Tire Class, like all members of the Tire Class, base their claims on the same set of activities engaged in by Firestone; namely the design, marketing, and distribution of faulty Tires. Likewise, the named Explorer Plaintiffs owned or leased allegedly defective vehicles at allegedly inflated prices, as did the members of the proposed class. Therefore, we find that the representatives' claims are "substantially similar," thereby satisfying the typicality requirement. *See Ruiz v. Stewart Associates, Inc.*, 171 F.R.D. 238, 242 (N.D.Ill. 1997) (citation omitted).

### (4) Adequacy of Representation

The named representatives must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy standard involves · two elements: one relates to the adequacy of the named plaintiffs' representation of the class and requires that there be no conflict between the interests of the representative and those of the class in general; the other relates to the adequacy of class counsel's representation. *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir.1977). Defendants, for good reason, we think, do not challenge the adequacy of the proposed class counsel's representation of the class. In our December 8, 2000 Order on Plaintiffs' Management Structure and Various Case Management Matters, we appointed these lawyers, after consideration of their qualifications, to the Plaintiffs' Executive Committee and to six topic-centered subcommittees. Accordingly, our analysis focuses on the first of the two factors.

Rule 23(a)(4) prohibits conflicts between proposed class representatives and members of the class in order to ensure that "the named plaintiff[s'] claim[s] and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Courts addressing adequacy must "assess the likelihood that a conflict of interest may exist." *Susman*, 561 F.2d at 94. Defendants maintain that "conflicts abound" between the class representatives and the members of the proposed class. Opp. at 93. . Specifically, they argue that the proposed classes create the following types of conflicts among putative class members: (1) class members who own recalled Tires have different interests from those who own Tires that have not been recalled; (2) class representatives and class counsel may undertake and have undertaken strategies to enhance the likelihood of class certification that may not be favorable to some members; (3) the claims of proposed class members who have had problems with their Tires or Explorers will be diluted by the presence of members who have not; (4) some Explorer diminution class members will have stronger claims than others; and (5) those who own the Tires but not Explorers (and vice versa) will have varying interests as to which Defendant is saddled with the blame. Opp. at 93–95.

We do not find Defendants' examples of potential conflicts to be so threatening as to preclude class certification. For instance, Defendants argue that there is a conflict between those with Tires subject to the August 9 recall as compared to those who own Tires subject to the September 1 advisory as compared to those who own Tires not subject to either remedial action. Opp. at 93. In support of their argument, Defendants cite deposition testimony from two named Plaintiffs. *Id.* One plaintiff, James Conley Stone, Jr., stated that "[o]nly people that ... have the recall tires, I believe, should be a part of the lawsuit." Stone Dep. at 27. Another plaintiff, Timothy Trouy, stated that he believes that "every tire manufactured by Firestone should be subject to a recall." Trouy

Dep. at 50. We first point out that many plaintiffs, even in individual suits, lack a sophisticated understanding of their claims or of legal strategy. Defendants cite no cases in support of the proposition that such lack of knowledge necessarily impedes class certification. In fact, there is case law to the contrary. *Paper Systems Inc. v. Mitsubishi Corp.,* 193 F.R.D. 601, 609 (E.D.Wis.2000) ("[T]here is no requirement that the representative plaintiff be knowledgeable of either the allegations or the legal theories on which the law rests."). Furthermore, Defendants have offered no explanation of how this issue, should it become a problem, could not be solved by the formation of subclasses.

Likewise, other potential "conflicts" highlighted by Defendants do not merit the alarm bells Defendants attempt to sound. Defendants argue that class representatives cannot embark on strategies that harm segments of the class in order to increase the likelihood of class certification. Opp. at 93 (citing *Feinstein v. Firestone Tire and Rubber Co.,* 535 F.Supp. 595, 606 & n. 16 (S.D.N.Y.1982) (criticizing proposed class representatives for arguing choice of law position ultimately rejected by court); *Clay v. American Tobacco Co.,* 188 F.R.D. 483, 493 (S.D.Ill.1999) (refusing to certify class on ground that proposed class representatives dropped claims which some members of proposed class could have pursued successfully as individuals)). According to Defendants, seeking to invoke the laws of Michigan and Tennessee is a strategy that sells out the class members from states with laws more favorable to plaintiffs. *Id.* The choice of law rules controlling this case dictate that the laws of Michigan and Tennessee apply, and arguing (correctly, in the Court's view) for their application, as Plaintiffs did, cannot defeat class certification. Defendants' other arguments are similarly unavailing. Hence, we conclude that Plaintiffs satisfy the last of the requirements of Rule 23(a).

**C. Unavailability of "Hybrid" 23(b)(2)/ (b)(3) Certification**

■ Having found that the class certification requirements of Rule 23(a) are met, we now examine whether the criteria set forth in Rule 23(b) are satisfied. Plaintiffs first assert that this case is suitable for class certification as a hybrid "23(b)(2)/(b)(3)" class action.

■ Certification under Rule 23(b)(2) is appropriate when the class is seeking injunctive or declaratory relief. Seventh Circuit case law also permits "divided certification" under which "[t]he district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages." *Lemon v. International Union of Operating Engineers, Local No. 139, AFL–CIO,* 216 F.3d 577, 581 (7th Cir.2000). Following our rulings on July 27, 2001, Plaintiffs' remaining claims are for damages under the theories of breach of warranty, violations of consumer protection statutes, and unjust enrichment. *Bridgestone/Firestone,* 155 F.Supp.2d 1069 (dismissing RICO, negligence and redhibition claims; permitting implied and express warranty claims, Magnuson Moss claims, unjust enrichment claims, and, possibly, consumer protection claims); *In re Bridgestone/Firestone, Inc. Tires Products Liability Litig.,* 153 F.Supp.2d 935 (S.D.Ind.2001) (dismissing Plaintiffs' claim for injunctive relief insofar as it requests a court-ordered recall, buy back, and/or replacement of the Tires). Plaintiffs maintain that declaratory relief is available because "the Court can find that the Tires and Explorers are dangerous, and implement classwide protective notice, or issue a declaration that Defendants must specify, manufacture and use tires with a safe, alternative design such as a nylon cap." Supp. Memo. in Support at 4. We agree with Defendants' characterization of these claims as little more than a request for a declaration that Defendants are financially responsible. This type of "declaratory" relief does not fit within the parameters of Rule 23(b)(2). *Cf. Ameritech Benefit Plan Committee v. Communication Workers of America,* 220 F.3d 814, 820 (7th Cir.2000) (overturning certification of defendant class under 23(b)(2) because, in part, plaintiff was merely seeking "a judgment declaring that a party is entitled to no money."). Hence, there is no portion of the case suitable for certification under Rule 23(b)(2). Moreover, where, as here, Plaintiffs' remaining claims are overwhelmingly

claims for damages, Rule 23(b)(3) is the only appropriate potential vehicle for certification. *See Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir.1999) ("When substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3) . . . .").

### D. Certification Under Rule 23(b)(3)

We now turn to the propriety of class certification under Rule 23(b)(3), which requires that common questions predominate and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy.

### (1) Predominance

Common questions predominate when they "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil* § 1778. *See Amchem*, 521 U.S. at 591, 117 S.Ct. 2231. Here, Plaintiffs must establish that common questions of law [17] or fact predominate with respect to the elements of their warranty, unjust enrichment, and consumer protection claims. We find that Plaintiffs have met this burden.

### (a) Predominance of Common Defect Issue

All the surviving theories of relief in the Master Complaint require that Plaintiffs prove that something is wrong with the products at issue. For instance, Plaintiffs argue that Ford violated § 445.903(1)(e) of the MCPA, which prohibits "representing that goods or services are of a particular standard, quality, or grade . . . if they are of another." Likewise, Firestone allegedly violated § 47–18–104(a)(7) of the TCPA which prohibits exactly the same behavior. Similarly, Plaintiffs assert that Defendants breached the express and implied warranties they extended to Plaintiffs by selling vehicles and/or Tires that were defective. Plaintiffs' unjust enrichment claim also depends upon proof that the vehicles and/or Tires were defective; in order to prevail on that claim, Plaintiffs must prove that the products Defendants sold were defective and that the prices they were paid for the products were therefore too high. Whether the Tires and/or Explorers are defective is a factual question that Plaintiffs intend to prove using common proof.

Firestone argues that the question of defect renders the class not suitable for certification because there are "over 280 distinct tire populations at issue" based on size, model, place of manufacture, failure rate and other factors. For instance, Firestone maintains that "[t]he core tire component—the inner liner—varies among tire designs in thickness and in the number of plies, depending on the needs of each product. The composition of body plies also varies depending on the performance requirements of the tire being produced." Opp. at 20 (citing Gardner Decl. ¶¶ 9–10). In addition, according to Firestone, sidewalls and steel-belt characteristics vary depending on the intended use for the tire model and size. *Id.* at 21.

In opposition, Plaintiffs point to persuasive evidence that Firestone has significantly exaggerated distinctions among the Tires. For example, Robert Martin, a retired Firestone Vice President of Corporate Quality Assurance, testified that differences between 15 inch and 16 inch Tires likely are negligible. Martin Dep. of 11/27/00 at 272. Specifically, he stated:

> The materials that are used in the 15–inch and 16–inch tire, for example, the body ply, was probably the same polyester material. The steel belts could be the same steel. The tread components could be the same. The sidewall compounds could be the same. The inner liner could be the same. Many components could be common.

Other Firestone officials testified similarly regarding other variations claimed by Defendant to be significant. Gregory Bond, foreman of the "B" Crew in the tire room at Firestone's Decatur plant, testified that he

---

**17.** As explained earlier in this opinion, the Court has found that all class members' claims will be governed by the laws of Michigan and Tennessee; hence, as will be explained below, common questions of law predominate.

would expect the rubber compounds to be the same regardless of whether the Tires were produced at the Decatur or Wilson plants. Bond Dep. of 6/20/01 at 53.

At the hearing, the parties also discussed a difference between one group of allegedly faulty Tires and another group of allegedly faulty Tires. However, even if this distinction turns out to be significant upon fuller development of the evidence, it hardly furthers Firestone's argument that common issues do not predominate. Beginning in 1995, Firestone undertook a manufacturing cost-reduction program, called "C95." Transcript at 30, 47–48, 145–46. These cost reductions allegedly made the Tires lighter. *Id.* at 30. In addition, at the hearing, Plaintiffs' counsel cited evidence that the accident rate for vehicles with these Tires increased following the implementation of the program. *Id.* at 30–31. Hence, evidence may show that 1995 and later model Tires should be put in a different subclass than 1994 and earlier model Tires, but this distinction is far from constituting the "over 280 distinct tire populations" based on the wide variety of factors propounded by Firestone. As such, we find that Firestone's arguments about the variety of Tires at issue do not defeat Plaintiffs' assertion that defect can be demonstrated (or disproved) by common proof.

With regard to defect, Ford makes an argument similar to that advanced by Firestone. Ford argues that Plaintiffs cannot meet their burden of advancing a defect theory and supporting evidence that is applicable to all Explorers. Opp. at 26. Ford's argument is not persuasive. In fact, Ford itself treated all Explorer models and years the same for many purposes. For instance, before December of 2000, Ford recommended a uniform tire inflation of 26 psi on 15 inch tires on Explorers, regardless of configuration, payload, or equipment. Because tire pressure is critical, in Ford's view, to rollover propensity, this "classwide" treatment is significant. *See* Lee Carr Dep. Ex. 18. Likewise, when serious problems began to appear with Explorers and Firestone Tires in the Middle East and South America, Ford generally treated Explorers as a class, with little differentiation as to model year or as to whether the vehicle was a four-wheel drive or a two-wheel drive vehicle. A draft of a document dated August 16, 1999 entitled "1995/99 Explorer/Mountaineer P255/70R16 Tire Separation in GCC [18] Countries" refers to Explorers throughout this period as being affected by the problem described as "Rollovers attributed to tire tread separation." Reply Ex. 27, Tab C.[19] In addition, some of the remedial actions considered by Ford were the same across model years. While we recognize that Ford states that the Tires, rather than the vehicles, are responsible for rollover accidents, the Court finds that this similar treatment of all Explorers, regardless of variations Ford now claims are significant, provides common proof to Plaintiffs with which to argue their case.[20] Whether Plaintiffs will succeed on the basis of this common evidence is not the question before us.

Ford further objects to the certification of an Explorer class on the ground that Plaintiffs must distinguish the Explorer from other makes of similar vehicles because Plaintiffs' theory is that Explorers have an

---

**18.** "GCC" stands for Gulf Cooperation Council. Member countries are Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the United Arab Emirates. The draft report on tire separation refers to the affected markets as the GCC states and Yemen, Jordan, Lebanon, and Syria. Reply Ex. 27, Tab C.

**19.** This document was filed under seal by Plaintiffs on May 17, 2001, because Ford had designated the document "Confidential" as provided by the Court's Confidentiality Order dated March 7, 2001. Ford, however, has not filed a motion requesting that the seal be maintained (as provided in the Court's *nunc pro tunc* Order of March 20, 2001), and the seal has therefore been automatically lifted.

**20.** We also note that Ford is not the only entity to group Explorers for the purpose of examining the problems called to its attention. NHTSA concluded that it is appropriate to group Explorers into the following four groups to calculate the static stability factor ("SSF"): 4–wheel drive Explorers, model years 1991–94; 4–wheel drive Explorers, model years 1995–1998; 2–wheel drive Explorers, model years 1991–94; and 2–wheel drive Explorers, model years 1995–98. 66 Fed. Reg. 3413, Table 2. While sub-classing may be necessary at a later point, for now, we find that Plaintiffs offer sufficient classwide proof of Explorer defect to warrant class certification.

"unreasonable tendency" to roll over. Opp. at 27. In *Walsh v. Ford Motor Co.*, the court explained that "[t]he plaintiffs' burden on remand was to identify reasonably a body of evidence which is common to all of the different Ford vehicles at issue and *which distinguishes the special characteristics* causing [the alleged defect] in Ford vehicles *from comparable non-Ford vehicles.*" 130 F.R.D. 260, 269 (D.D.C.1990) (emphasis added); *see also Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017–18 (D.C.Cir.1986). Ford argues that the same standard must apply here. According to Defendant, it is not enough that the Explorers be alike; they must also be alike in a way that distinguishes them from peer vehicles. Opp. at 26.

We are not convinced by Ford's argument or by the rule set forth in *Walsh* on which it is based. First, Ford cites no authority for the proposition that showing an "unreasonable" rollover tendency can only be accomplished by demonstrating that the product at issue differs in some way from similar products. Neither the district court in *Walsh* nor the appellate court that established the burden provided the reasoning behind their rule that "unreasonable" must mean "different," and we find that such a proposition runs counter to logic. A defect can be statistically common, but still unreasonable. At the certification hearing, Plaintiffs' counsel stated that "[w]e would never let the Pinto off simply because the Torino blew up too." Transcript at 40. This lawsuit is about whether Ford is at fault for producing defective Explorers, not about whether some other manufacturer is at fault for producing defective vehicles that compete for sales with the Explorer.[21] Second, whether the Ford Explorer exhibits an unreasonable tendency to roll over is a merits question, unsuitable for resolution at the class certification stage. At the moment, we are interested only in whether Plaintiffs have demonstrated that they can offer representative proof on this issue. *See Szabo*, 249 F.3d at 676. Demonstrating that all the vehicles encompassed by the class definition share similar characteristics with regard to the alleged defect is sufficient to establish that common issues of material fact predominate.

### (b) Predominance of Other Common Issues

While the issue of defect is central to this case, we must examine whether common issues predominate with respect to the other elements of Plaintiffs' claims. *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 186–87 (3d Cir.2001) ("We began our analysis by examining the elements of the underlying cause of action, noting that such an analysis is critically important to the predominance determination under Rule 23(b)(3).").

### (i) Consumer Protection Claims

With regard to Plaintiffs' claims under the consumer protection statutes of Tennessee and Michigan, Defendants maintain that the need to establish individual reliance defeats predominance. Supp. Memo. in Opp. at 18–19. Much of Defendants' argument is based on our earlier ruling in which we determined that "[s]hould the Plaintiffs wish to prosecute their suits under the TCPA and MCPA individually, they shall be granted leave to amend the complaint in order to allege individual reliance." *Bridgestone/Firestone*, 155 F.Supp.2d at 1109. We reasoned that both statutes require "a causal link between the alleged misrepresentation or omission and the injury." *Id.* at 1108. Plaintiffs' rebuttal to Defendants' argument is contained in both the class certification briefing and in the briefs submitted in conjunction with Plaintiff's motion for reconsideration of these portions of the July 27, 2001 Order. We examine this issue with regard to both motions in light of additional briefing on the subject and our finding explained above regarding the availability of the class action mechanism to pursue consumer protection claims.

We examine the Michigan Consumer Protection Act first. In our prior ruling, we noted that "the Supreme Court of Michigan

---

21. Ford, of course, is entitled to defend itself against a finding of "unreasonable" rollover tendency with evidence of peer vehicles' rollover rates, as well as with any other evidence that tends to refute Plaintiffs' claim of "unreasonableness."

held 'that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations [as long as] ... the class can establish that a reasonable person would have relied on the representations.' " *Bridgestone/Firestone*, 155 F.Supp.2d at 1108–09 (quoting *Dix v. American Bankers Life Assurance Co. of Florida*, 429 Mich. 410, 415 N.W.2d 206, 209 (1987)). We ruled, however, that because Plaintiffs cannot bring a class action under the MCPA on behalf of a nationwide class, they were subject to a different pleading standard set forth in other Michigan cases requiring individual proof that Ford's alleged bad acts caused their injuries. *Id.* at 1109 (citing *Mayhall v. A.H. Pond Co., Inc.*, 129 Mich.App. 178, 341 N.W.2d 268, 270 (1983); *Zine v. Chrysler Corp.*, 236 Mich.App. 261, 600 N.W.2d 384, 398 (1999); and Mich. Comp. Law § 445:911(2)). As explained earlier in this ruling, Plaintiffs are permitted to bring a class action under the MCPA. Hence, the procedure set up in *Dix*, through which class plaintiffs can demonstrate reliance based on the inference of what a reasonable person would do, is available to the members of the class proposed here.

Defendant Ford attempts to distinguish *Dix* on the ground that the court did not examine the language of the Michigan statute. Supp. Opp. at 19 n. 17 (citing *Dix*, 415 N.W.2d at 210). As with our recognition that the Tennessee courts, after reading presumably the same text of the TCPA available to us, implicitly interpreted the TCPA so that it does not preclude class actions, we find also that the Supreme Court of Michigan has done the same, interpreting the MCPA to allow proof of reliance based on reasonable inference, at least in class action cases. In *Gilkey v. Central Clearing Co.*, a federal district court in Michigan reached a similar conclusion. 202 F.R.D. 515, 525–26 (E.D.Mich.2001). There, the court found that the proposed class representative was adequate in an MCPA action despite the defendants' argument that the proposed class representative testified that he did not rely upon the allegedly false disclosures. *Id.* (quoting *Dix*, 415 N.W.2d at 209). The courts in both *Dix* and *Gilkey* reasoned that

the Consumer Protection Act should be construed liberally so as "to provide an enlarged remedy for consumers who are mulcted by deceptive business practices" and that because the Act allowed for class actions, recognizing that reliance could be shown on a representative basis was necessary to effectuate the statute's remedial purpose. *Dix*, 415 N.W.2d at 209; *Gilkey*, 202 F.R.D. at 525–26.

Defendant Ford also argues that common representations were at issue in *Dix* but are not crucial to Plaintiff's case here and that, hence, common issues do not predominate with respect to the MCPA. Supp. Memo. in Opp. at 19 n. 17. Ford overstates *Dix*. The remainder of the paragraph cited by Ford acknowledges that the misrepresentations may vary a little from plaintiff to plaintiff without defeating class certification. *Dix*, 415 N.W.2d at 210 ("The alleged misrepresentations may differ somewhat from plaintiff to plaintiff, but, if the plaintiffs' allegations are true, they are all substantially similar and are all part of a common scheme."). Furthermore, in *Dix*, material omissions formed another basis for the plaintiffs' claims. *Id.* at 207.

Plaintiffs here can apparently produce both types of evidence in order to make their case to the jury. Plaintiffs present evidence that Ford engaged in a national advertising campaign to disseminate a common message to all consumers. Examples of these advertisements tout the Explorer's "exceptional control," "smooth ride and excellent handling," and "reputation of high quality, dependability, and trust." Compl. ¶ 124(a)(b)(g) (citing ads in *People*, 12/31/99; *Newsweek*, 12/15/97; *Ebony* 09/95; *Essence* 01/96; and *Black Enterprise* 02/97). Certainly, as Ford points out, other advertisements making different representations about Explorers were placed in local and regional publications by dealers and dealer associations. Scott Aff. ¶ 3. Ford does not dispute that the Explorer was promoted through national advertisements like the ones cited above. Such advertisements, while they lack specificity and may ultimately fail to convince a jury that Ford made misleading representations to customers, do con-

stitute a core of alleged common misrepresentations relevant to Plaintiffs' MCPA claim.

In addition, Plaintiffs also point to common evidence that Ford made material omissions by failing to reveal defects in Explorers about which they contend Ford was aware. For instance, on October 15, 1986, R.J. Bacigalupi, a Ford engineer, sent a memorandum to C.A. White, discussing stability of the Explorer while it was still in development. Plaintiffs' Rebuttal Bench Book, Tab C, Ex. 11.[22] He stated that lowering the vehicle, adding weight low in the vehicle, and widening the track were better alternatives to changes in tire size. *Id.* Mr. Bacigalupi then added, "Cost or timing implications of these kind [sic] of actions tend to stall them in their tracks." At the hearing on class certification, Plaintiffs' counsel highlighted the following quote from a document authored by Roger Stornant, a Ford employee, in late 1989: "I believe that management is aware of the potential risk with the P235 tires, and they have accepted the risk." Transcript at 28. If true, we conclude that a jury could find that a reasonable person would have changed his or her purchasing decision if this information had been available, and these omissions buttress our conclusion that common issues predominate as to the MCPA claims.[23]

In our July 27, 2001 Order, we held that, while the TCPA formally does not require plaintiffs to prove reliance, they must "indicate 'how the deceptive act affected the contested trade.'" *Bridgestone/Firestone,* 155 F.Supp.2d at 1109 (quoting *Ganzevoort v. Russell,* 1995 WL 623047, at *2–3 (Tenn.Ct. App. Oct.25, 1995)). Indeed, proximate cause is a required element of claims under the consumer protection statute in Tennessee. *E.g., Harvey v. Ford Motor Credit Co.,* 1999 WL 486894, at *2 (Tenn.Ct.App. July 13, 1999) ("T.C.A. § 47–18–109 establishes a private right of action for any person who suffers an ascertainable loss as a result of the use or employment by another person of an unfair or deceptive act or practice.") (internal quotation omitted). The question presented here concerns the options plaintiffs have for proving proximate causation.

As Firestone properly points out, Plaintiffs cannot claim that common affirmative misrepresentations affected their purchasing decisions. Unlike the situation with the Ford Explorer, the subject Tires were not the focus of a national ad campaign. None of the national tire advertisements in the Master Complaint mentions ATX, ATX II or Wilderness AT tires. Compl. ¶ 127. Most advertising for Firestone tires was done through numerous retailers at the local and regional level and was not subject to much central

---

**22.** This document was originally filed under seal, but for the same reasons explained in *supra* note 19, the seal has been lifted.

**23.** Ford maintains that common issues also do not predominate with respect to two other elements of an MCPA claim. Defendant argues that individualized inquiries would be needed concerning whether each purported class member bought his or her vehicle "primarily for personal, family, or household purposes." Supp. Opp. at 19 (quoting Mich. Comp. Laws § 445.902(d)). We recognize that, under Michigan case law, whether the class member used his or her vehicle primarily for personal use is an individualized question. *Zine,* 600 N.W.2d at 401. However, such a question is a rather simple one. *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 n. 4 (7th Cir.1974) ("Even if it is necessary to review the contracts individually to eliminate business purchases, ... such a task would be neither herculean [sic], inhibiting, nor for that matter ... unique.") (internal quotation omitted). Hence, individualized inquiry into consum-

er or business status does not defeat class certification. *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, L.L.C.,* 198 F.R.D. 503, 506 (N.D.Ill.2001) (certifying class of debtors suing under Fair Debt Collection Practices Act (FDCPA) despite defendants' argument that only consumer debts are covered by the FDCPA and that eliminating business debtors was individualized inquiry); *see also Simer v. Rios,* 661 F.2d 655, 672 (7th Cir.1981) (while meaning of "predominance" not explained by the rule, the term does not mean that *every single* issue must be common). Ford also argues that each class member would have to prove what his or her expectations were in order to prevail under the MCPA. Supp. Opp. at 19. We find that this issue is so intimately wrapped up in the question of reliance that it too can be demonstrated through the expectations of a reasonable person. *See Dix,* 415 N.W.2d at 209; *cf. Bridgestone/Firestone,* 155 F.Supp.2d at 1109 (considering loss under MCPA as frustrated expectations *after* finding that individual reliance must be shown *in non-class action cases* ).

direction. Pence Declaration ¶ 2, 5. Any representations made to individuals at the time of sale certainly would not be uniform for the millions of class members.

However, it appears that Plaintiffs can produce common evidence of material omissions by Firestone. For instance, Plaintiffs have produced some evidence that officials at Firestone were aware of problems with the Tires long before a recall was announced on August 9, 2000. The Tire Adjustment Data that has been the subject of discovery motions suggests that, in the mid–1990s, Firestone was aware of an increase in belt edge separation and belt-leaving-belt separation in the radial ATX tire. Transcript at 48. Furthermore, a jury could find that Firestone concealed problems with the Explorer in combination with its Tires and that Firestone acquiesced, if not actively participated, in the decision to lower the recommended tire pressure of the Tires on Ford Explorers, despite awareness that a ·lower psi would compromise Tire performance. Transcript at 29–30.

On the basis of these alleged omissions, a jury could infer that Firestone concealed information from Plaintiffs that, if known, would have prevented them from purchasing the Tires. Defendants argue that concealment of information cannot constitute proximate cause as required by the TCPA. Opp. to Reconsideration at 14. Defendants base their argument on *Harvey*, 1999 WL 486894, at *2. In *Harvey*, the court dismissed a TCPA claim, rejecting Mr. Harvey's claim that he was "required to pay hidden fees." *Id.* Defendants' interpretation of *Harvey* reads too much into that decision, in our view. The court continued its analysis following the excerpt relied upon by Defendants, noting that although the exact allocation of the payment between dealer and defendant was not revealed to the plaintiff, Mr. Harvey was aware of the overall payment and total interest rate. *Id.* Because the plaintiff did not allege that he

would have refused to engage in the transaction had he known that some portion of his payment would go to the dealer and because Mr. Harvey knew the total rate, there was no "hidden fee" at issue to form the basis of the case. *Harvey* cannot prevent a jury from basing its decision on an inference (that information concerning the alleged defect would have had an impact on Plaintiffs' purchasing decisions) common to all class members. Hence, common issues predominate with respect to Plaintiffs' TCPA claims.

### (ii) Express Warranty Claims

■ Plaintiffs' breach of express warranty claims are based upon three distinct theories: written warranties, warranties created by advertising, and warranties created by oral representations made to individual Plaintiffs at the time of sale. The propriety of certifying a class as to each of these theories is discussed in turn below.

Defendants [24] argue that Plaintiffs' breach of express warranty claims are based upon a wide variety of written warranties that differ in numerous ways: for example, both durational limitations (based on time, mileage, and/or tread wear) and applicable exclusions (e.g. commercial use, negligent use) vary depending upon which Firestone written warranty is applicable to a given Plaintiff. Which written warranty, if any, that each Plaintiff received depends upon when and where that Plaintiff purchased his or her vehicle or Tires. Although Defendants argue that these variations in written warranties will require individualized inquiries into each Plaintiff's purchase and use of the vehicles and Tires, it is unclear to us how the vast majority of these individualized inquiries will be relevant to Plaintiffs' claims. All of the applicable written Firestone warranties provide coverage if the tires "become unusable for any reason within the manufacturer's control" within a given time period, or within

---

**24.** Defendants jointly make this argument, but only point specifically to the variations in Firestone's written warranties. Perhaps this is because, while Ford's written warranties vary somewhat from model year to model year, we have already determined that the variations are not relevant to the Plaintiffs' claims in this case.

*Bridgestone/Firestone*, 155 F.Supp.2d at 1114. All of the warranties contain the provision that Ford's dealers will "repair, replace or adjust all parts (except tires) ... that are defective in factory-supplied materials or workmanship for 3 years or 36,000 miles (whichever occurs first)."

a given amount of tread wear on the tire. Under Plaintiffs' express warranty theory, each and every Tire included in the class definition was "unusable" at the moment it was purchased due to a design defect. Therefore, with the exception of the "commercial use" exclusion that may be applicable to some Plaintiffs,[25] none of the exclusions contained in the warranty, which relate to the use (or abuse) of the tire after purchase, would be relevant. Plaintiffs' express written warranty claim against Firestone ultimately will rise or fall depending on whether they, as a group, using classwide proof, are able to prove that all of the Tires were "unusable," as that term is used in the Firestone warranties, at the time of purchase.[26] Similarly, the Plaintiffs' express written warranty claim against Ford ultimately will depend upon whether the Plaintiffs, as a class, are able to prove that all of the Explorers included in the class definition were "defective in factory-supplied materials or workmanship," as that term is used in Ford's written warranties, when they were sold. These common issues predominate the Plaintiffs' claims for breach of express written warranties.

█ Defendants also argue that individualized proof will be required to support Plaintiffs' claim that the durational limits contained in the applicable written warranties are unconscionable, manifestly unreasonable, fail of their essential purpose, and therefore are unenforceable.[27] The Plaintiffs' claim, however, is that the durational limits in the written warranties were rendered unenforceable because each Defendant knew its product was defective at the time it extended the warranty to each Plaintiff and actively concealed the defect from the Plaintiffs (and everyone else), so that the Plaintiffs were unable to enforce their warranties within the time limit provided. This claim therefore will succeed or fail based upon proof of the Defendants' conduct and knowledge, which will be applicable to the class as a whole.[28]

█ Defendants further argue that, under both Tennessee and Michigan law, in order to prevail on the breach of express warranty claims, each individual Plaintiff will have to prove that he or she relied upon the terms in the warranty when deciding to purchase the vehicle or Tires. As far as the Defendants' written warranties are concerned, the Court disagrees. The relevant U.C.C. provision, U.C.C. § 2 313(1)(a),[29] does not require a showing of reliance by the buyer; rather, it provides that "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." [30] Defendants have cited no case in

25. The Court does not view the issue of whether each Plaintiff purchased the Tire for personal or commercial purposes, which for the vast majority of Plaintiffs can be resolved in a simple and straightforward manner, to be sufficient to defeat predominance. *See Simer*, 661 F.2d at 672 (term "predominance" does not mean that *every single* issue must be common).

26. As discussed below, claims for property damage (including to the tire itself) based upon a tread separation or other outward failure of a Tire are not appropriate for class certification, precisely because of the highly individual questions regarding whether the failure was caused by a defect in the Tire or something else, such as the types of misuse which may be excluded under some of Firestone's written warranties.

27. This argument is also applicable to the Plaintiffs' breach of implied warranty claim.

28. The Defendants argue that, even under the Plaintiffs' theory, their knowledge regarding the alleged defects changed over time, and that what they knew and when they knew it will be relevant to whether the exclusions in each particular Plaintiff's warranty was unconscionable at the time of purchase. The questions of what each Defendant knew and when, and the relationship of that knowledge to the unconscionability issue, will certainly have to be answered. However, the answers to those questions will apply to all of the Plaintiffs, and once it is determined whether, and at what point, the warranty exclusions became unconscionable in light of the Defendants' knowledge and actions, it will be a simple matter to determine on which side of that line a Plaintiff's purchase falls.

29. The relevant state statutes, Mich. Comp. Laws § 440.2313 and Tenn.Code. Ann. § 47–2–313, are substantively identical to the U.C.C. provision.

30. Ford cites to *Monte v. Toyota Motor Corp.*, 2001 WL 1152901 (Mich.Ct.App. Sept.28, 2001), for the general proposition that, under Michigan law, reliance is an element of an express warran-

which a court has ruled that an express written warranty provided to a consumer upon the purchase of a product was unenforceable by the consumer because it was not part of the basis of the bargain.[31] Whether the consumer was aware of the terms of the written warranty before the purchase or not, it was certainly part of the bargain, in that the warranty was part of what the seller sold to the buyer.[32]

The official comments to U.C.C. § 2–313 support this holding. Official Comment 7 provides:

> The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract.

A buyer certainly cannot prove that she relied upon an affirmation made after the closing of the deal in deciding whether to consummate the deal; however, the U.C.C. clearly contemplates that such post-sale affirmations can be enforced as warranties, as long as they "are fairly to be regarded as part of the contract." *See Murphy*, 582 N.Y.S.2d at 531 (holding that written warranty given to plaintiffs at time of delivery of motor home, after purchase price had been paid, was part of basis of bargain). Accordingly, we determine that Plaintiffs need not demonstrate reliance on the written warranties in order to enforce the terms of those written warranties against Defendants, and, further, no individual proof that the written warranties received by Plaintiffs (or, more likely, a subclass of Plaintiffs) were part of the basis of each Plaintiff's bargain will be required.

■ The same is not true of Plaintiffs' express warranty claim based upon the Defendants' advertising, however. Even assuming that Plaintiffs will be able to demonstrate that each Defendant conducted extensive, nationwide advertising campaigns about its respective products, and that those advertising campaigns contained statements sufficiently specific to create a warranty that the products were safe, or that the products had some other quality they did not actually have,[33] the existence of such advertising, is not sufficient, in and of itself, to demonstrate that the statements in the ads were part of the basis of the bargain when each Plaintiff purchased his or her Tires or Explorers. Unlike a written warranty given to a consumer as part of that individual consumer's purchase transaction, advertisements are simply put out for public consumption by a company in the hopes that they will be seen (or heard) and considered by potential buyers, who will then be induced to become actual buyers, in whole or in part because of the advertisements. For some Plaintiffs, the

ty claim. The court in *Monte* held that the plaintiff could not base an express warranty claim on descriptions of his vehicle's Supplemental Restraint System contained in the Owner's Manual and Owner's Guide because the plaintiff received those documents "after the bargain was already struck" and therefore could not have relied on any statements therein. The court cited no authority for this holding, and did not discuss whether it believed that reliance was synonymous with the U.C.C.'s "basis of the bargain" requirement. The court also did not address the official comments to the U.C.C., discussed below, which address the creation of express warranties via post-sale statements. In any event, we are not bound by this unpublished decision, *see* Mich. Ct. R. 7.215 ("An unpublished opinion is not precedentially binding under the rule of stare decisis."), and in light of its conclusory nature, we do not find it persuasive precedent.

**31.** Indeed, such an interpretation of the law "would, in effect, render almost all consumer warranties an absolute nullity," inasmuch as it is common practice for warranty booklets to be provided to consumers inside the sealed box in which a product is packaged, or, in the case of vehicles, in the glove box of a new car upon delivery. *Murphy v. Mallard Coach Co.*, 179 A.D.2d 187, 582 N.Y.S.2d 528, 531 (N.Y.App.Div. 1992).

**32.** As discussed above, Defendants themselves rely upon the durational limitations contained in their written warranties; Defendants cannot seriously suggest that the terms of the written warranties favorable to them are enforceable, while the terms favorable to the Plaintiffs are not enforceable.

**33.** As discussed in the above section on the elements of consumer protection act claims, with regard to Firestone, this assumption is unwarranted. ATX, ATX II, and Wilderness AT tires were not promoted through national ad campaigns. As to Ford, we note again the lack of specificity in most of the ads cited by Plaintiffs.

advertisements likely were successful, and those Plaintiffs may well demonstrate that statements in Defendants' ads were part of the basis of their bargain. For other Plaintiffs, however, this will not be the case, and those Plaintiffs will not have a breach of warranty claim based upon Defendants' advertising. *See, e.g., Masters v. Rishton*, 863 S.W.2d 702, 706 (Tenn.Ct.App. 1992) (breach of express warranty not available to plaintiff who had never seen any advertisements for or heard any representations about the safety of the product at issue); *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364, 370 (E.D.Mich.1977) ("It is clear that advertisements and promotional literature can be a part of the basis of the bargain where they are prepared and furnished by a seller to induce purchase of its product and the buyer relies on the representations."); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F.Supp.2d 226, 246 (D.Conn.1998) ("While advertisements can be part of the basis of the bargain, the plaintiff must show, at a minimum that he or his agent knew of and relied on the statement.") (citing 1 J. Wright & R. Summers, *Uniform Commercial Code* § 9–5, at 494–95 (1995)); *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436–37 (Tex. 1997) (plaintiff could not prevail on express warranty claim based on advertisements when he could not show that he saw or relied upon the defendant's advertisements).

While the Court need not, and thus will not, delve into the issue of precisely what type of proof would be required for a Plaintiff to prevail on an express-warranty-created-by-advertising claim, it is clear that the claim cannot be established by classwide proof. Rather, an examination of each Plaintiffs' exposure to, and consideration of, Defendants' various ads would be required. It is also clear that this inquiry will not fall into the same simple and straightforward category as proof of when and from whom a class member purchased the Tires and/or Explorer; rather, it almost certainly will require credibility determinations and other individual, unwieldy factual and legal determinations. We determine that these substantial individual issues preclude a finding that common issues will predominate in the resolution of Plaintiffs' claim for breach of express warranty based upon advertising, and therefore we decline to certify classes as to that claim.

For the same reasons that Plaintiffs' advertising-related warranty claims are not amenable to class certification, to the extent that some Plaintiffs assert express warranty claims based upon oral representations made to them at the time of sale, those claims clearly are not common to the class as a whole, and therefore are not appropriate for class certification. Accordingly, no classes are certified as to those claims.

### (iii) Implied Warranty Claims

■ As discussed above, the issue of product design defect is common to all Plaintiffs' breach of implied warranty claims. Under Plaintiffs' theory, the defects in the Explorer and the Tires rendered them unmerchantable at the time of sale, and therefore Defendants are liable for breach of the implied warranty of merchantability. This common issue undoubtedly predominates the Plaintiffs' breach of implied warranty claims.

■ Defendants argue, however, that the requirement of predominance is nevertheless defeated because Plaintiffs will be unable to use classwide proof to demonstrate privity between each Plaintiff and Defendants. As for Ford, this argument is entirely unavailing, inasmuch as privity is not required for breach of implied warranty actions under Michigan law. *See Jennings v. Southwood*, 446 Mich. 125, 521 N.W.2d 230, 234 n. 5 (1994) (noting that the Michigan Supreme Court eliminated the privity requirement in actions for breach of implied warranty) (citing *Spence v. Three Rivers Builders & Masonry Supply, Inc.*, 353 Mich. 120, 90 N.W.2d 873 (1958)); *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800, 804 (1970) (holding, after extensive discussion, that Michigan law does not require privity in breach of implied warranty action, even if only economic loss is involved), cited with approval in *Greenfield Die & Mfg. Corp. v. John H. Powers, Inc.*, 2000 WL 33413347, at *1 (Mich.Ct.App. Aug.1, 2000) ("[P]rivity of

contract is not required in order for a plaintiff to maintain an action for breach of warranty under the UCC. This rule applies even where, as here, the loss claimed is purely economic.") (citations omitted); and *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.,* 192 Mich.App. 333, 480 N.W.2d 623, 628–29 (1991) (same); *but see Downriver Internists v. Harris Corp.,* 929 F.2d 1147, 1149 (6th Cir.1991) (stating that Michigan has abolished the privity requirement only as to warranty cases based on personal injury, and not as to "breach of contract action[s] for economic losses").[34] As the court in *Cova* explained, Michigan courts have determined that "[o]n principle the manufacturer should be required to stand behind his defectively-manufactured product and held to be accountable to the end user even though the product caused neither accident nor personal injury. The remote seller should not be insulated from direct liability where he has merely mulcted the consumer." *Cova,* 182 N.W.2d at 804.

██ As for the implied warranty claims against Firestone, Plaintiffs correctly concede that privity is required under Tennessee law where no personal injury or property damage is involved. Therefore, it will be necessary to determine whether each Plaintiff satisfies the privity requirement in order for that Plaintiff to succeed on the breach of implied warranty claim. This fact alone does not make class certification improper, however. Each Plaintiff obviously will have to prove that he or she owned or leased a vehicle with one of the types of Firestone tires included in the class definition. For purposes of establishing privity, each Plaintiff will also have to prove from whom he or she purchased the relevant Tires, which seems to the Court to add little, if any, additional burden, either on the parties or on the ultimate fact finder. The universe of sellers from whom the Plaintiffs' Tires were purchased can then be divided into categories, and, if necessary, the class can be divided into subclasses.[35] The question of privity can then be examined as to each category or subclass. For example, those Plaintiffs who purchased their Tires from a private individual—for example, as part of the purchase of a used Explorer or other vehicle—clearly will not be in privity with Firestone, and all Plaintiffs who fall into that subclass likely will not have a viable breach of implied warranty claim against Firestone. More complex factual and legal issues such as agency may be involved in determining whether those Plaintiffs who purchased their Tires as original equipment on a Ford Explorer from a Ford dealership, or as replacement tires from a Firestone dealer, or from an independent retailer like Sears or Wal Mart, are in privity with Firestone. However, Plaintiffs assert, and Defendants do not genuinely dispute, that these types of sellers also can be divided into discrete subclasses based upon the sellers' relationship, if any, with Firestone.[36] The issue of privity then can be determined as to all of the Plaintiffs within each subclass. Plaintiffs would thus be able to prove privity with Firestone, if at all, by classwide, not individual, proof. Accordingly, the privity requirement under Tennessee law does not defeat predominance in this case.[37]

**34.** We note that both *Downriver Internists* and the case cited therein, *National Sand, Inc. v. Nagel Const., Inc.,* 182 Mich.App. 327, 451 N.W.2d 618 (1990), involved commercial, not consumer, transactions. Indeed, the *National Sand* case did not involve a warranty claim at all.

**35.** The Court contemplates that the necessity for, and the definitions of, any such subclasses will be clarified as a result of discovery, summary judgment procedures, and/or the stipulations of the parties.

**36.** The use of these subclasses also can address Defendants' concern that each Plaintiff will have to demonstrate "whether the tires or Explorers were purchased in a manner in which a written warranty from Firestone or Ford might attach."

Defendants' Opposition at 55. Defendants' own phrasing of this issue demonstrates that the question of whether an individual Plaintiff received a written warranty from Ford or Firestone—and indeed what the terms of the written warranty were—will be answered by looking at where (or from whom) and when the Plaintiff purchased the vehicle or Tires.

**37.** In its Response to Plaintiffs' Bench Book Filing at 30, Ford also argues that, as to the breach of implied warranty claims, "another significant, highly individualized issue is what each putative class member did after discovering the defect and the related issue of when he/she supposedly made the discovery." While, as the Michigan cases cited by Ford suggest, these issues may be

### (iv) Unjust Enrichment Claims

██ As an alternative to their breach of express warranty claims, Plaintiffs have asserted an unjust enrichment claim against Defendants. In order to prevail on their unjust enrichment claim, under either Tennessee or Michigan law, Plaintiffs will have to demonstrate that (1) Ford and/or Firestone received a benefit at the expense of the Plaintiffs and (2) it would be inequitable or unjust for Ford and/or Firestone to retain that benefit. *See Michigan Educ. Employees Mut. Ins. Co. v. Morris,* 460 Mich. 180, 596 N.W.2d 142, 151 (1999); *Newton v. Cox,* 954 S.W.2d 746, 748 (Tenn.Ct.App.1997). Plaintiffs allege that Defendants were unjustly enriched by selling defective Explorers and Tires for the price of non-defective Explorers and Tires. In other words, the wholesale price the Defendants received for their defective products was too high. Obviously, this claim, like the warranty claims, depends primarily upon a showing of defect, a classwide issue. The amount of excess revenue received by Defendants, if any, will also be demonstrated by classwide, expert testimony, and will be calculated on a per vehicle, rather than a per Plaintiff, basis.[38] The amount of the excess revenue to which each Plaintiff is entitled will, under Plaintiffs' theory, be determined by an apportionment process, which will depend upon evidence of when and from whom each Plaintiff purchased the vehicle or Tires.[39] However, as we have stated before, those straightforward factual questions are not the type of individual issues that defeat a finding of predominance. Rather, the predominant issues relevant to Plaintiffs' unjust enrichment claim are those common to all Plaintiffs—whether the Explorer and the Tires were defective at the time of sale and whether because of that defect Defendants received excess (i.e. unjust) revenues from their sale.

### (v) Property Damage Claims

██ As we noted in our November 28, 2001 Order, the Court denies the Plaintiffs' motion to certify a subclass of persons who have sustained property damage as a result of a tread separation incident. Although we have found that Plaintiffs can pursue their other claims on a classwide basis, the nature of the proposed property damage claims will differ significantly. It will be necessary for each individual class member to prove (1) that the defect caused his or her tread separation incident, (2) that the claimed property damages were caused by his or her tread separation incident, and (3) that the damages warrant a particular, individual monetary award. Common issues would not predominate in a trial of these claims.[40] Certification of a property damage subclass is therefore denied.[41]

---

relevant in tort-based product liability claims (because they are relevant to the issues of contributory negligence or assumed risk) they are entirely irrelevant to the contract-based breach of warranty claims involved in this case.

38. Defendants also argue that predominance is defeated to the extent that Plaintiffs seek recovery for a diminution of the resale value of their Explorers. However, the Court does not understand the Plaintiffs to be seeking such damages, given the claims remaining in the case. (We understand their claim to be for diminished value at the time of the sale.) *See* Transcript at 65 ("Warranty claims, the unjust enrichment, the potential claims for consumer trade practices, all involve the defendant's [sic] misconduct at the time they had sold a new vehicle. Therefore, they all relate to the overpayment for a new vehicle.") (statement by Plaintiffs' counsel).

39. Defendants suggest that the retail price paid by each Plaintiff, not the wholesale price received by Defendants, is the relevant inquiry.

The Court disagrees. The relevant inquiry under Plaintiffs' theory will be the amount Defendants inequitably earned from the sale of defective Explorers and Tires. If Plaintiffs are to prevail on their unjust enrichment claim, it will have to be on the basis of expert testimony that will demonstrate the amount per vehicle and/or Tire by which the price Defendants received exceeded the price they should have received, given the defects in the Explorers and Tires. This expert testimony will apply classwide, and will not depend upon the amount each Plaintiff actually paid for the product.

40. Moreover, it is more difficult to conclude that class treatment of these claims is otherwise a superior method of adjudication. If a class member's property damage is significant, maintenance of an individual action is more likely to be economically feasible.

41. Denial of certification will not, however, exclude persons who have incurred property damage from the Tire Class definition. These per-

### (2) Superiority

■ Rule 23(b)(3) also requires Plaintiffs to establish that a class action would be the "superior" manner in which to resolve the controversy. Four factors are to be considered:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

We address these factors in order. Prior to the consolidation of this matter in MDL proceedings and to the filing of the Master Complaint, a number of similar class actions had been filed in various courts.[42] In contrast, neither Defendants nor Plaintiffs have called our attention to the filing of any individual suits seeking damages for breach of warranty, unjust enrichment, or consumer protection act violations. Hence, there appears to be little interest in individual control of this action, and the first factor is therefore satisfied. *O'Brien v. Encotech Construction Services, Inc.*, 203 F.R.D. 346, 351–52 (N.D.Ill.2001) ("[T]he court in this case has not been informed by either party of any pending suits brought by individual class members … and thus … there does not appear to be an interest in controlling the prosecution of the state claims.") (internal quotations omitted).

■ The second factor—the extent and nature of litigation already pending—militates in favor of certification. Because this MDL has consolidated proceedings against Ford, Firestone, and Bridgestone arising out of allegedly faulty Tires and Explorers, "the extent and nature of any litigation concerning the controversy already commenced by … members of the class" is limited. The filing of the Master Complaint consolidated most of the then-existing federal class action cases. State class action lawsuits remain pending, but neither side suggests this development as a reason to deny certification here.[43]

■ The third factor—the desirability of concentrating the litigation in a particular forum—favors certification. We are aware that MDL consolidation, in and of itself, does not satisfy this condition. Instead, the question to be examined is whether the "concen-

---

sons, unless they opt out of the class to pursue their claims on an individual basis, will be treated as Tire owners and will be entitled to recover to the same extent as other Tire owners, but they will not recover for property damage resulting from alleged Tire failures.

**42.** *See, e.g., Spied v. Bridgestone/Firestone, Inc., et al.*, IP 00–5035–C–B/S (now pending in the MDL); *Davison v. Bridgestone/Firestone, Inc., et al.*, IP 00–5052–C–B/S (same); *Grant v. Bridgestone/Firestone, Inc., et al.*, Case No. 009–3668 (Pa.Ct.Cm.Pl.) (pending in Pennsylvania state court); *Burkes v. Bridgestone/Firestone, Inc., et al.*, No. 00–026711 CZ (Wayne County Cir. Ct.) (pending in Michigan state court).

**43.** Firestone argues that the absence of any individual lawsuits by proposed class members demonstrates that certification here would create a "judicial 'nightmare of a class action,'" when the Tires of all such Plaintiffs "have performed perfectly [and therefore, Plaintiffs] have not been hurt by Firestone." Firestone Supp. Reply in Opp. at 11 (quoting *Isaacs v. Sprint Corp.*, 261 F.3d 679, 682 (7th Cir.2001)). Our response to this argument is two-fold. First, assuming Fire-

stone's familiarity with our earlier ruling on the motion to dismiss, Firestone apparently does not argue that Plaintiffs do not make a colorable claim of loss in the surviving causes of action. *See Bridgestone/Firestone*, 155 F.Supp.2d at 1099 (explaining that under implied warranty of merchantability, for example, Plaintiffs can suffer actionable loss absent injury to property or person). Instead, Firestone must be arguing (no more appropriately) that Plaintiffs ultimately will not succeed on the merits of their claim. *Rahim v. Sheahan*, 2001 WL 1263493, at *10 (N.D.Ill. 2001) (at class certification stage, "focus [is not] the substantive strength or weakness of the plaintiffs' claims …") (interpreting *Szabo* and *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Second, Firestone's argument is not connected to the aim of this subsection of Rule 23. Courts generally look at the progress of litigation in other courts so as to avoid inconsistent results and duplication of effort. *Cf. Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 838 (7th Cir.1999) (comparing progress of *Blair* litigation to overlapping class action before another judge as part of process of determining whether *Blair* class action was "superior vehicle").

trat[ion] of the litigation of the claims in the particular forum" should take the form of class certification. *See Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir.1996) (superiority of class certification not a foregone conclusion by virtue of multi-district consolidation for pretrial proceedings). We find that it should. In our view, class certification is the most appropriate means of continuing this litigation. As Plaintiffs note, without class certification, if individual Plaintiffs wish to continue pursuing their claims,[44] either we must try hundreds of claims or we must remand them to the transferor courts who will then be faced with the need to try hundreds of cases. Supp. Memo. in Support at 19. Such a result would be immensely burdensome to the courts, parties, and witnesses. This would also create the risk of inconsistent results. And while these multitudinous lawsuits are clogging the courts, other litigants must wait and wait and wait. Thus, this factor clearly supports class certification.

The key factor in the superiority inquiry for this case, however, is the last criterion listed in Rule 23—manageability. Defendants' most strenuous objection to manageability is Plaintiffs' alleged failure to propose a workable trial plan. Opp. at 69–71; Firestone's Memo. in Resp. to Bench Book at 25–27. Defendants maintain that myriad individual issues preclude even the possibility of a workable trial plan. *E.g.*, Firestone's Supp. Reply in Opp. at 10 (more than two hundred tire populations for which individualized questions exist). As explained in the discussion of predominance, the individual issues in this case are not nearly as daunting as Defendants claim. Also, as discussed earlier, subclassing is available if certain factual distinctions appear material after fuller de-

velopment of the facts. Defendants, of course, object to using subclasses as a solution to this potential issue, claiming that the sheer number of subclasses would render the class action unmanageable. *E.g.*, Opp. at 72. We are not dissuaded by this argument, however. Most of the distinctions to which Defendants refer are completely immaterial and therefore will not create the need for subclasses.[45] As noted above, legally relevant distinctions (including, for example, privity in connection with the implied warranty claims under Tennessee law) can be managed through subclassing, a procedure that commends itself in practical terms and is specifically authorized by Rule 23(c)(4)(B). *See also Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 760 (7th Cir.2000) ("The fact that Rule 23 provides for subclasses when they are efficient makes it clear that the existence of multiple subclasses, in and of itself, is not sufficient to justify the district court's denial of class certification.").

Also, contrary to Defendants' argument, Plaintiffs have succeeded in painting a picture of the proposed trial that satisfies Rule 23. Plaintiffs' Bench Book, Ex. Q (Class Trial Structure); Plaintiffs' Rebuttal Bench Book, Ex. M (Declaration of Elizabeth J. Cabraser Re: Class Action Trial Plan/Trial Structure). In this trial plan, as in the trial plan for a hypothetical individual action on these claims, certain claims (such as consumer protection and warranty claims) will be tried to the jury and other claims (unjust enrichment) will be tried to the Court. *Id.* Defendant Firestone objects, stating, "It is not sufficient to say, for example, that unjust enrichment claims can be tried to the Court. To prevail on their class motion, plaintiffs would have had to explain how those claims

---

**44.** We anticipate, of course, that most Plaintiffs would drop their claims. *Amchem*, 521 U.S. at 617, 117 S.Ct. 2231 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. The class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (quoting *Mace*, 109 F.3d at 344).

**45.** Due to our earlier choice of law decision, reaffirmed here today, this case does not involve the numerous subclasses on the basis of state law variation that plague the pursuit of class certification in many cases. *See, e.g., In re Ford Motor Co. Ignition Switch Products Liability Litig.*, 174 F.R.D. 332, 352 (D.N.J.1997) ("As things now stand, it is apparent that appropriate adjudication of the issues in the MDL case would require an unduly large number of subclasses that would divide up the plaintiffs by, among other factors, vehicle model, model year, *and the law that governs their claims*.").

could be proved, and defended, on a class-wide basis, without hopelessly bogging down in unmanageable individual issues ..." Firestone's Resp. to Bench Book at 26. We agree in principle, but this concern is the same as Defendants' argument on predominance, and we have addressed it above. Common proof constitutes the focus of evidence on unjust enrichment and other claims.[46] To round out the metaphor, Plaintiffs' "picture" is admittedly grand in scope, and quite ambitious; however, it is recognizable as a conventional trial construct, rather than as a surrealist exercise.

Likewise, the trial plan satisfies the requirements of due process and the Seventh Amendment. Defendants argue that the class trial would be so bewildering to any jury that it would violate the due process rights of Defendants and absent class members. Supp. Memo. in Opp. at 17. Alternatively, according to Defendants, the use of multiple juries to adjudicate these complex claims would violate the Seventh Amendment "right to have juriable issues determined by the first jury impaneled to hear them ..., and not reexamined by another finder of fact." Opp. at 73–74 (quoting *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir.1995)). In response, we note that juries are often faced with the responsibility to make difficult and complex decisions, yet they manage to perform admirably. We have no doubt that the jury impaneled in this case will sift through the jury instructions and evidence with full competence.[47] Furthermore, the cases cited by Defendants on this issue do not support their position. Opp. at 72 n. 80. *Malcolm v. National Gypsum Co.*, 995 F.2d 346, 350 (2d Cir.1993), *In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 373 (2d Cir.1993), and *Cain v. Armstrong World Indus.*, 785 F.Supp. 1448, 1457 (S.D.Ala.1992), were all personal injury cases, not class actions. In contrast, as we found above, common issues make up the bulk of the case, thus limiting the complexity Defendants have attempted to magnify.

Finally, Defendants argue that there are other, "superior" methods for resolving this controversy. First, they contend that continued MDL treatment, absent class certification, will significantly advance the litigation. Supp. Memo. in Opp. at 17. Obviously, however, MDL treatment can take a dispute only so far. The authorizing statute, 28 U.S.C. § 1407, allows that civil actions "may be transferred to any district for coordinated or consolidated *pretrial proceedings.*" (emphasis added). Certainly, coordinated discovery and consideration of pretrial motions has been efficient so far and hopefully will continue to be, but multidistrict litigation alone is not the "superior method for the fair and efficient adjudication of the controversy." *See* Fed.R.Civ.P. 23(b)(3). Second, according to Defendants, the NHTSA process for investigating and remedying consumer complaints and alleged safety-related vehicle defects is superior to the class action mechanism. Opp. at 75. While we recognize the role that NHTSA plays in promoting highway safety, we also are aware that the remedies available to NHTSA are not the same as those available through the judicial process. *See In re Bridgestone/Firestone, Inc. Tires Products Liability Litig.*, 153 F.Supp.2d 935 (S.D.Ind.

---

**46.** Firestone also objects to the trial plan because it would involve bifurcation or "multifurcation," according to Firestone's view. Firestone's Resp. to Bench Book at 26. Firestone is correct to note that bifurcation would be necessary for any claims on behalf of a property damage class. Even Plaintiffs admit that the Court would need to "bifurcate any eventual trial ... between a liability phase common to all of the subclasses and an individual damages phase for each [individual] property damage subclass member." Memo. in Support at 45 n. 26. However, we determined above that there will be no property damage subclass because common issues do not predominate for that subclass. The "multifurcation" to which Firestone refers consists of "sepa-

rate trials for liability, for collective damages, for punitive damages from Firestone, [and] for exemplary damages from Ford." Firestone's Resp. to Bench Book at 26. Multiple "trials" on these issues are no more needed here than they would be for a hypothetical individual plaintiff pursuing all of these claims against both Ford and Firestone. In any event, bifurcation, if ultimately necessary, is permitted. *See Rhone–Poulenc*, 51 F.3d at 1303 ("[Seventh Amendment problems do] not arise when the same jury is to try successive phases of the litigation.").

**47.** Defendants' Seventh Amendment argument has no application to a case tried to a single jury.

2001). Courts should not cede their proper role to an administrative agency.

## CONCLUSION

For the reasons explained above, Defendants' Motions to Reconsider our November 28, 2001 Order Certifying Classes is *DENIED*. The Court also *DENIES* Ford's Motion for Reconsideration of the Court's Order Granting in Part and Denying in Part the Motion to Dismiss the Master Complaint. For similar reasons, Firestone's Motion for 28 U.S.C. § 1292 Certification of the July 27, 2001 Order is *DENIED*. Finally, Plaintiffs' Motion for Reconsideration of Ruling on the Scope of the TCPA/MCPA in July 27 Order Granting in Part and Denying in Part the Motion to Dismiss the Master Complaint is *GRANTED*.

Further, it is ordered that Plaintiffs submit for approval by January 16, 2002, the proposed notice to class members and tender therewith their proposed method and schedule for disseminating said notice.

### *ORDER CERTIFYING CLASSES*

Having held the hearing on class certification and having notified the parties that a ruling will issue by the end of the year, the Court rules on Plaintiffs' Motion for Class Certification at this time in aid of its jurisdiction.[1] The Court *GRANTS* in part and *DENIES* in part Plaintiff's motion. An order setting forth in full the Court's analysis of the parties' arguments on this issue will follow shortly. Time for appeal under Federal Rule of Civil Procedure 23(f) will begin to run on the date of the entry of the latter order or, assuming the timely filing of the motion to reconsider, on the date of a ruling on a motion to reconsider our ruling. *See Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 837 (7th Cir.1999) ("[W]e hold that a motion for reconsideration filed within ten days of 'an order of a district court granting or denying class action certification' defers the time for appeal until after the district judge has disposed of the motion."). Notice to the class shall be deferred until a the final order on these issues from the Court.

The Court certifies the following classes and sub-class:

## EXPLORER CLASS:

All current residents of the United States who either (a) owned or leased a 1991 through 2001 model year Ford Explorer as of August 9, 2000 (the "Current Explorer Owner subclass") or (b) owned or leased a 1991 through 2001 model year Ford Explorer prior to August 9, 2000 (the "Former Explorer Owner classes").

### Explorer Sub–Class:

All current residents of the United States who purchased, owned, or leased, at any time from 1990 to the present, Ford Explorers, model years 1991 through 2001, that are or were equipped with Tires (as defined below).

### TIRE CLASS:

All current residents of the United States who owned or leased at any time from 1990 to the present, vehicles that are or were equipped with Firestone ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja, and Wilderness tires; all tires that are the same as Firestone ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja, and Wilderness tires but sold by Firestone under other brand names; and all other tires manufactured by Firestone that are the same or are substantially similar[2] to Firestone ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja and Wilderness tires ("Tires").

The Court denies Plaintiffs' motion insofar as it asks for certification of a class consisting of "[a]ll current residents of the United States who owned or leased at any time from 1990 to the present, vehicles equipped with

---

**1.** It has come to our attention that a request is pending before the Circuit Court of Greenville County of South Carolina to certify a class of South Carolina owners of Explorers equipped with Firestone tires which may be ruled upon imminently.

**2.** This definition incorporates the subclasses in paragraphs 1–6 of Plaintiff's Class Structure/Class Definition, filed on November 16, 2001.

Tires that failed, resulting in property damage."